1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THOMAS MATHEWS,

        Plaintiff,

  v.

ORION HEALTHCORP INC,

        Defendant.

_____/

No. C -13-04378 EDL

**ORDER REGARDING THE PARTIES'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

Plaintiff Thomas Mathews, the former Vice President of Sales of Defendant Orion

HealthCorp, Inc., alleges that Defendant breached Plaintiff's employment agreement and unilaterally

terminated him in violation of California's public policy.  On August 5, 2014, the Court held a

hearing on the parties' cross-motions for partial summary judgment.[1]  For the reasons stated at the

hearing and in this Order, Plaintiff's Motion for Partial Summary Judgment is granted in part and

denied in part, and Defendant's Motion for Partial Summary Judgment is denied.

**Facts**

Defendant is a Georgia company that provides medical billing and practice management.

Mathews Decl. ¶ 3.  Plaintiff worked for Defendant from early 2011 until August 2013.  Id.  After

Plaintiff began employment with Defendant, Defendant presented Plaintiff with an "Employment

Agreement," which Plaintiff signed without making any changes, making him the Vice-President of

---

[1]    Plaintiff moved for partial summary judgment on the first (breach of contract), second (breach of contract), third (breach of contract), fifth (breach of covenant of good faith and fair duty), seventh (breach of contract provision relating to termination without cause), eighth (relation and wrongful termination in violation of public policy), ninth (violation of California Labor Code sections 201 and 203), and tenth (breach of contract relating to Management Incentive Plan Bonus) claims. Defendant moved for partial summary judgment on Plaintiff's fourth (violation of California Labor Code section 204), fifth, sixth (conversion), seventh, eighth, ninth, tenth claims and Plaintiff's claim for punitive damages.

1   Client Relations and Sales.  Id. ¶ 4; Ex. 1; Brinkman Decl. ¶ 5; Boomer Decl. Ex. M at 44.  The

2   Employment Agreement incorporated the first of three plans for payment of commissions to

3   Plaintiff.  See Mathews Decl. Ex. 2 (2011 Commission Plan); Ex. 3 (2012 Commission Plan); Ex. 4

4   (2013 Commission Plan).

5           Section 5 of the Employment Agreement states:

6           The Executive will be paid commissions in accordance with the Plan attached as
            Exhibit A, as may be modified from time to time in the Company's discretion.

7

8   Mathews Decl. Ex. 1 at 2 at ¶ 5.  The 2011 Commission Plan was attached to the Employment

9   Agreement.  Id.  The 2011 and 2013 Commission Plans contain the following language:

10          The Company will have the right to change and interpret the commission plan in its
            sole discretion.

11

12  Mathews Decl. Ex. 1 at 2011 Plan at 2.   Plaintiff stated in his declaration that he "did not feel that I

13  needed to request a change in my commissions' plan related to Orion's discretion to change the

14  plans because Orion's CEO told me and others that any change in the terms of the Plan would apply

15  to future deals and not those deals already closed by the Sales team."  Mathews Reply Decl. ¶ 5.

16  Plaintiff also stated that at meetings in 2012, various executives of Orion stated that any changes to

17  the commission plans would not be retroactive, and that one executive stated: "We want you to be

18  well compensated . . . your role is critical."  Mathews Reply Decl. ¶ 6.  The 2012 Commission Plan

19  was not memorialized in a formal document like the 2011 and 2013 Plans.

20          The Employment Agreement also contained the following language regarding resignation of

21  employment for good reason:

22          The Executive may terminate his employment under this Agreement for Good
            Reason. For purposes of this Agreement, the Executive will have "Good Reason" to
23          terminate the Executive's employment upon the occurrence of any of the following
            circumstances, without the Executive's express written consent: (I) a material
24          diminution in the Executive's position or authority (except for Cause as defined in
            paragraph 8(c) above or during periods when the Executive is unable to perform all
25          or substantially all of the Executive's duties and/or responsibilities as a result of the
            Executive's illness (either physical or mental) or other incapacity); (ii) a requirement
26          by the Company that the Executive change the Executive's principal place of business
            to a place more than thirty (30) miles from its location on the date of this Agreement;
27          (iii) a breach of a material provision of this Agreement by the Company which is not
            cured within thirty (30) days of written notice from the Executive to the Company
28          specifying in reasonable detail the nature of such breach; or (iv) any material
            reduction in the Executive's Base Salary. . . . the Executive will be deemed to have

                                                    2

waived his rights pursuant to circumstances constituting Good Reason if he has not provided to the Company a Notice of Termination (as defined below) within sixty (60) days following his knowledge of the circumstances constituting Good Reason. The Company shall have thirty (30) days after receipt of a Notice of Termination from the Executive to cure the basis, events, or reasons giving rise to the circumstances underlying the Executive's Notice of Termination. . . .

Mathews Decl. Ex. 1 at 3 at ¶ 8(d). The Employment Agreement provided that if Plaintiff was terminated without cause or if Plaintiff resigned with good reason, as described in paragraph 8(d), Plaintiff would be entitled to a generous severance package. Id. at 5 at ¶ 9(c). If Plaintiff was terminated for cause or if Plaintiff resigned for any reason other than good cause, he would be entitled to a less substantial severance package. Id. at 4-5 at ¶ 9(b).

The Employment Agreement contained a choice of law provision designating Georgia law as the governing law. Mathews Decl. Ex. 1 at 9 at ¶ 18. In his deposition, Plaintiff stated that a California lawyer reviewed the Employment Agreement and concluded that because Plaintiff lived and worked in California, California law would apply. Boomer Decl. Ex. M at 45; see also Mathews Reply Decl. ¶ 3 ("I worked with the understanding [from the California lawyer who reviewed the agreement] that California law applied to any employment claims I might have."). Plaintiff did not tell anyone at Orion that he wanted to change the choice of law provision. Boomer Decl. Ex. M at 46; Mathews Reply Decl. ¶ 3 (stating that because he had consulted with a California employment lawyer, he "did not push for changes to the agreement I otherwise would have requested.").

Under the Commission Plans, Plaintiff was entitled to commissions for his sales work a number of months after the sales were made. Mathews Decl. ¶ 10 ("I would not receive commission for my sales work until well after the sales were made, as commissions payment followed approximately 90 days for contract implementation, 30 days for generation of the first invoice and four months of invoicing."). Plaintiff stated that he worked primarily for commissions on his sales work, which included, among other things, identifying potential clients, developing marketing efforts and negotiating deals. Id. ¶ 9. Plaintiff also earned an annual base salary of $190,000. Mathews Decl. Ex. 1 at 2 at ¶ 4.

Plaintiff and his sales team closed deals with at least six customers, on five of which Defendant made commission payments to Plaintiff under the 2011 and 2012 Plans, and on one of

1   which Plaintiff was to be paid under the 2013 Plan.  Mathews Decl. ¶ 11.  At each customer closing,

2   Plaintiff, along with others, developed an annualized revenue model, and obtained a signed contract

3   from each client to close the deal.  Id. ¶ 12.  Dale Brinkman, Defendant's CEO, testified as the

4   Federal Rule of Civil Procedure 30(b)(6) witness for Defendant that Plaintiff had completed his

5   obligations as Vice President of Sales with respect to his customers.  Brown Decl. Ex. 2 at 66 ("Q:

6   So you're not aware of anything else left to do with respect to working for any customers? A: I am

7   not aware.").

8          Defendant paid Plaintiff commissions pursuant to the three Commission Plans every month

9   beginning after he started earning commissions and through June 2013.  Mathews Decl. ¶ 8.

10  Defendant paid commissions of between 2% and 4.5%, depending on the commission plan in place

11  at the time.  Id. ¶ 15.

12         In 2012 and 2013, Defendant was facing bankruptcy.  Brinkman Decl. ¶ 3.  On June 14,

13  2013, Constellation Health, a private equity group led by Paul Parmar, acquired Defendant through a

14  merger.  Id.  After the acquisition, Dale Brinkman replaced Terry Bauer as Defendant's CEO.  Id.

15  Brinkman worked with Parmar and Defendant's President, Joe Seale, to restructure debt, reduce

16  costs and implement operational changes to revive the company.  Id.  One of the changes was to

17  revise Defendant's commission plans.  Id.  Prior to Defendant's acquisition, Bauer had created a

18  Management Incentive Program ("MIPP") under which executives would receive bonuses if there

19  was a change in control of the company, provided that they remained employed or did not resign for

20  good reason prior to the Incentive Bonus Employment Date of October 31, 2013.  Brinkman Decl. ¶

21  4.

22         On July 12, 2013, an email containing the commission amounts earned based on the June

23  profit and loss statement, and due to be paid on July 26, 2013 ("July 2013 commissions") (Mathews

24  Decl. Ex. 5 at 3) went out to Defendant's executives, followed by an email from Parmer stating:

25  "We are putting all comm [commissions] on hold till we finalize a new structure which is in next 10

26  days.  Which will include how to handle past clients as well."  Brinkman Decl. Ex. E.  Brinkman

27  informed Plaintiff of this decision as soon as it was made.  Id. ¶ 11.  The decision did not affect

28  commissions paid for June 2013, which were eventually all paid to employees.  Id.

4

**United States District Court**
For the Northern District of California

Thereafter, Defendant's executives worked to design a new commission plan.  Brinkman Decl. ¶ 12.  They sought Plaintiff's input during the process and borrowed elements from some of the companies that he had researched.  Id.  Creating the new commission plan took longer than Defendant expected, and was not completed within the promised ten day time frame but was in late August 2013, after Plaintiff was terminated.  Id.

Commissions remained frozen during the time that a new plan was being developed.  Brinkman Decl. ¶ 13.  Defendant also considered whether to apply the new plan retroactively to incoming revenue, including revenue received which ordinarily would have been used to calculate and pay commissions in late July 2013.  Id.  Thus, commissions that were normally due to Plaintiff and others in July 2013 were delayed.  Id.

During that time, Brinkman spoke to and emailed Plaintiff on a number of occasions to assure him that Defendant was working on a new commission plan and that commissions would be paid once the new plan was finalized.  Brinkman Decl. ¶ 14; Ex. F; Mathews Decl. ¶ 20.  Brinkman stated in an email that: "We know they [commissions] are due.  I think the revised commission plan will give you some idea of what we are thinking going forward."  Mathews Decl. Ex. 6.  Plaintiff did not believe that Defendant was being forthright about the completion date of the new plan.  Mathews Decl. ¶ 20.  In his deposition, Plaintiff testified that Brinkman told Plaintiff that there would be a new plan, and that no one ever told Plaintiff that there would not be a new plan.  Boomer Decl. Ex. M at 139.  Plaintiff states that as of August 17, 2013, Defendant had threatened not to pay commissions for June 2013, had refused to pay them in July 2013 and had not approved commissions for August 2013.  Id.; Ex. 8.  Defendant did not tell any employee that it would not be paying any commissions on past sales.  Brinkman Decl. ¶ 14.

During the five weeks after Parmar's July 12, 2013 email announcement that commissions were being delayed, Plaintiff made numerous oral and written attempts to get Defendant to commit to paying commissions for Plaintiff and his sales team members.  Mathews Decl. ¶ 19.  Plaintiff also made numerous complaints about nonpayment and requests for commissions for himself and his team members.  Id.; Ex. 5, 6.  Plaintiff also made more than one oral request to Brinkman and Seale regarding payment of commissions.  Id.  Plaintiff had discussions with Defendant's Human

5

United States District Court
For the Northern District of California

1  Resources Director to express concerns about the nonpayment of commissions.  Id.

2         On August 17, 2013, Plaintiff, believing that he was required to do so pursuant to his

3  Employment Agreement, sent Brinkman a letter (dated August 16, 2013) in which he claimed to

4  have good reason to resign from the company under paragraph 8(d) of his Employment Agreement

5  based on the nonpayment of commissions and a material diminution in Plaintiff's authority.

6  Mathews Decl. ¶ 21; Ex. 9.  The letter detailed Plaintiff's belief that there had been a breach of a

7  material provision of the Employment Agreement because Defendant failed to pay Plaintiff's

8  commissions for July 2013 in the amount of $11,144.19.  Mathews Decl. Ex. 9 at 1.  Further,

9  Plaintiff stated that he understood that commissions for August 2013 had not been approved or

10  processed.  Id.  Plaintiff also stated that there had been a material diminution in his authority without

11  cause or a sound reason.  Id.  For example, Plaintiff stated that his sales efforts were being

12  coordinated using his direct reports who were told not to discuss efforts with him, that his marketing

13  initiatives had not been approved, that he was no longer included in executive meetings, that others

14  in the company were engaged in sales efforts directly to the exclusion of the sales team, and that he

15  no longer had the ability to decide who attended sales meetings.  Id. at 1-2.  In particular, Plaintiff

16  stated that Parmar was working with Trish Hutcherson, one of Plaintiff's direct reports, on a

17  different approach to taking Defendant's services to market, but that Plaintiff was not involved in

18  the decision making process.  Mathews Reply Decl. ¶ 17.  Plaintiff also stated that Defendant failed

19  to provide approval for Plaintiff and his team's attendance at trade shows, and that Plaintiff used to

20  be able to make those decisions himself.  Mathews Reply Decl. ¶ 19.  Plaintiff concluded the letter

21  as follows:

22         Notwithstanding the fact that I believe I have "Good Reason" to terminate based on
        the diminution in my position or authority, I intend to remain an employee of Orion if
23         it cures the violations as described herein and in the attached Complaint within the 30
        day period as provided in ¶ 8(d) of my Executive Employment Agreement.
24

25  Mathews Decl. Ex. 9 at 2.  Plaintiff stated in his declaration that he included this final sentence to

26  make it clear that he was not resigning.  Mathews Reply Decl. ¶ 10.

27         As referenced in the August 17, 2013 letter, Plaintiff had also filed a complaint in the Marin

28  County Superior Court.  Brinkman Decl. Ex. G; Mathews Decl. ¶ 22.  Plaintiff stated that he filed

1    the state court action as a preemptive measure to protect himself against a lawsuit by Defendant's

2    new owner in Georgia.  Mathews Reply Decl. ¶ 11.

3           Plaintiff believed that he earned the July 2013 commissions by developing the annualized

4    revenue models and obtaining signed customer agreements.  Mathews Decl. ¶ 28.  When he learned

5    that Parmar believed that "the company was paying too much to the salespeople in commissions,"

6    and learned that there would be a new commission structure, Plaintiff believed that the new plan

7    would result in lower commissions.  Id.  Between Parmar's announcement in July 12, 2013 about the

8    hold on commissions and the date of the August 17, 2013 letter, Plaintiff believed that the

9    commission plans would be replaced and Plaintiff would not be paid.  Id.  Plaintiff notes that

10   Defendant could have paid him for commissions under the 2011 and 2012 Plans even if it was

11   revising the 2013 Plan.  Id.  Plaintiff states: "Because payment of a lesser amount under a different

12   commissions plan than one of the Plans [he had already signed] did not constitute payment of earned

13   July 2013 commissions in my opinion, I believed that Orion announced it was refusing to pay my

14   July - and subsequent future - commissions when it stated it was paying commissions under other

15   plans."  Id.; see also Mathews Reply Decl. ¶ 12 ("For all these reasons, I virtually knew as of August

16   2013 that Orion would be proposing to pay me under the New Plan, and that the commissions would

17   be a lot less, and never again could I count on receiving commissions.").  Plaintiff concedes that

18   under the Plans, Defendant had the right to change commission structures as to commissions for

19   future sales, but argues that Defendant could not make changes retroactively.  Pl.'s Opp. at 5.

20          In his declaration, Plaintiff states that he "certainly intended" to remain employed when

21   Defendant cured the violations in his letter, and he "certainly did not" intend to leave his

22   employment before receiving an expected bonus of approximately $50,000 from the MIPP program

23   in October 2013.  Mathews Decl. ¶¶ 23, 27.  Plaintiff did not have any substitute job lined up when

24   he wrote the August 17, 2013 letter, although he had contacted at least two people for the purpose of

25   identifying new job opportunities.  Id.; Mathews Reply Decl. ¶ 16.  Plaintiff sent the August 17,

26   2013 letter and filed the state court complaint "to obtain maximum leverage" to get paid.  Mathews

27   Decl. ¶ 23.  Further, Plaintiff believed that had he not followed the protocol in his Employment

28   Agreement for bringing these issues to Defendant's attention through a good reason letter, "it was

1    unlikely that Orion would have taken my requests that it pay me and restore my authority seriously.

2    The prior five weeks of letter writing certainly did not work." Id. ¶ 24.

3         Brinkman forwarded Plaintiff's August 17, 2013 letter to Parmar.  Brown Decl. Ex. 2 at 191.

4    Parmar responded shortly thereafter, stating: "No problems.  We will take care of him.  Stop all

5    checks and payments to him and cancel his benefits immediately."  Id.  Brinkman interpreted

6    Plaintiff's conclusion in his August 17, 2013 letter to mean that Plaintiff intended to remain

7    employed *if and only if* Defendant satisfied each of his demands in the letter and in the complaint

8    within thirty days.  Brinkman Decl. ¶ 17 ("I also believed it tied Orion's hands and prevented us

9    from working out any concerns he [sic] might have had with him.").  Brinkman disagreed with

10   Plaintiff's position in the letter, stating that the company had not breached the Employment

11   Agreement as to the commission because the commission plans stated that Defendant could change

12   the commission arrangements at any time and because there was no refusal to pay, there was only

13   delay in payment.  Brinkman Decl. ¶ 18.  Further, Brinkman also stated that the letter lacked merit

14   with respect to the August 2013 commissions because the letter was written one week before

15   commissions were scheduled to be generated.  Id. ¶ 19.  Brinkman also believed that Plaintiff's

16   diminution of authority argument was baseless for several reasons.  Id. ¶ 21.  However, Plaintiff

17   points to Brinkman's Rule 30(b)(6) testimony to prove the diminution of authority when Brinkman

18   testified that:

19        I mean, he didn't have total authority to just go out and spend money like he was
          before.  We approved those [sales meetings].  So yes, he didn't have the total ability
20        to do what he had been doing before.  He no longer -- he had review over what he
          was doing and what he was spending and who he was sending where and what trade
21        shows he was going to.

22   Brown Decl. Ex. 2 at 207.

23        Defendant believed that Plaintiff had left the company with two choices: (1) acquiesce to

24   Plaintiff's demands that Defendant believed were premature and meritless; or (2) accept Plaintiff's

25   resignation.  Id. ¶ 22.  Defendant chose to accept Plaintiff's resignation.  Id.  Plaintiff, however,

26   argues that because his letter did not indicate an intention to immediately resign, Defendant

27   unilaterally terminated him.  Pl.'s Opp. at 5.

28        On August 20, 2013, Brinkman sent Plaintiff a letter accepting Plaintiff's resignation

8

1  effective immediately.  Brinkman Decl. ¶ 23; Ex. I.  Prior to receipt of Plaintiff's good reason letter,

2  there had been no discussion about terminating Plaintiff.  Id. ¶ 24 ("I personally hoped Mathews

3  would help the company grow as it emerged from financial distress.").  Brinkman stated that

4  Plaintiff's request for commission did not motivate his termination; rather, the decision to accept his

5  resignation was made because Defendant did not want to accede to his demands.  Id.

6       On August 20, 2013, Plaintiff replied to Brinkman's letter.  Mathews Decl. ¶ 26; Ex. 11.  In

7  one email to Brinkman, Plaintiff stated: "I did not resign my employment . . . please tell me whether

8  Orion truly intends to terminate my employment."  Id.  Brinkman responded that since Plaintiff had

9  "put the matter in the hands of attorneys" and filed a state court complaint, Brinkman could no

10  longer discuss the case with Plaintiff.  Brinkman Decl. ¶ 25.

11  **Legal Standard**

12       Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

13  file, and any affidavits show that there is no genuine issue as to any material fact and that the

14  movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

15  which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

16  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

17  to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

18  favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

19  from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

20  court must not weigh the evidence or determine the truth of the matter, but only determine whether

21  there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

22       A party seeking summary judgment bears the initial burden of informing the court of the

23  basis for its motion, and of identifying those portions of the pleadings and discovery responses that

24  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

25  323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

26  demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

27  where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

28  merely by pointing out to the district court that there is an absence of evidence to support the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may

2   not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts

3   showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the

4   nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

5   judgment as a matter of law."  Celotex, 477 U.S. at 323.

6   **Discussion**

7   **1.**      **California law governs Plaintiff's claims.**

8         When confronted with a choice-of-law question, a federal district court sitting in diversity

9   must use the choice-of-law rules of its forum state to determine which state's substantive law to

10  apply.  See Fields v. Legacy Health Sys., 413 F.3d 943, 950 (9th Cir. 2005).  Therefore, the Court

11  applies California's choice-of-law rules.

12         California choice-of-law rules and the Restatement (Second) of Conflict of Laws reflect

13  strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses in

14  contracts.  See Nedlloyd Lines B.V. v. Sup. Ct., 3 Cal.4th 459, 462 (1992).  Thus, a freely

15  negotiated contractual choice-of-law provision will be enforced in California unless "(a) the chosen

16  state has no substantial relationship to the parties or the transaction and there is no other reasonable

17  basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a

18  fundamental policy of a state which has a materially greater interest than the chosen state . . . ."  Id.

19  at 465 (quoting § 187(2) of the Restatement (Second) of Conflict of Laws).

20         Under Nedlloyd's analysis, a court must first determine "(1) whether the chosen state has a

21  substantial relationship to the parties or their transaction, or (2) whether there is any other

22  reasonable basis for the parties' choice of law."  Id. at 466.  If neither prong of the inquiry is met,

23  then the Court need not enforce the parties' choice of law.  However, if either part of the test is met,

24  then the Court must decide whether the law of the chosen state is contrary to a fundamental policy of

25  California.  If there is a conflict, the Court must determine whether California law has a materially

26  greater interest in the determination of the issue than the chosen state.  If California has a greater

27  interest, then the Court will not enforce the parties' choice of law.  Id.

28         Here, Plaintiff's Employment Agreement, which incorporates the 2011 Commission Plan,

United States District Court
For the Northern District of California

1   contains a choice of law provision designating Georgia law.  Defendant argues that because there is

2   a choice of law provision in the Employment Agreement, further choice of law analysis is improper

3   and all of Plaintiff's claims arising out of California law should be dismissed.  Under Nedlloyd,

4   however, this is only half of the inquiry.

5          The parties do not dispute that Georgia has a substantial relationship to the parties or their

6   transaction, or that there is a reasonable basis for the parties' choice of law.  Therefore, the Court

7   must examine whether Georgia's law is contrary to a fundamental policy of California.  California

8   has a strong public policy in applying its employment laws:

9          The Legislature finds and declares the following:

10          (a) All protections, rights, and remedies available under state law, except any
            reinstatement remedy prohibited by federal law, are available to all individuals

11          regardless of immigration status who have applied for employment, or who are or
            who have been employed, in this state.

12

13   Cal. Labor Code § 1171.5(a); see also Smith v. Rae-Venter Law Group, 29 Cal.4th 345, 360 (2002)

14   ("the prompt payment of wages due an employee is a fundamental public policy of this state");

15   Hammrel v. Acer Europe, S.A., 2009 WL 30130, at 5 (N.D. Cal. Jan. 5, 2009) (noting "California's

16   important 'interest in protecting employees of its state, and enforcing [its] wage laws,' . . .")

17   (internal citation omitted).  Thus, California has a fundamental policy in applying its employment

18   laws, one of which imposes waiting time penalties based on a delay in payment of wages.  See Cal.

19   Labor Code § 203.  Further, California has a "strong public policy against enforcing choice-of-law

20   provisions that would abrogate the plaintiffs' rights to pursue remedies."  See VanSlyke v. Capital

21   One Bank, 503 F. Supp. 2d 1353, 1361 (N.D. Cal. 2007).  The parties agree that Georgia law does

22   not permit waiting time penalties, putting it in conflict with a fundamental California policy.

23          The next question is whether California has a materially greater interest than Georgia in this

24   litigation.  To determine whether California has a materially greater interest than Georgia, the Court

25   analyzes the following factors:  "(1) the place of contracting; (2) the place of negotiation of the

26   contract; (3) the place of performance; (4) the location of the subject matter of the contract; and, (5)

27   the domicile, residence, nationality, place of incorporation, and place of business of the parties."

28   Ruiz v. Affinity Logistics Corp., 667 F.3d 1318, 1324 (9th Cir. 2012) (citing 1–800–Got Junk? LLC

v. Superior Court, 189 Cal.App.4th 500, 116 Cal.Rptr.3d 923, 932 n. 10 (2010) (citing Rest., § 188)).  Although Defendant is a Georgia company, on balance California has a materially greater interest in this litigation.  Plaintiff entered into the Employment Agreement in California, he negotiated it in California, and he worked in California.  Thus, the Court declines to apply the Georgia choice of law clause in this case.

**2.      There is a triable issue of fact as to Plaintiff's claim for conversion of future, uncalculated commission payments, but not as to the July 2013 commissions.**

Under California law, the elements of conversion are:  "(1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages."  Mindys Cosmetics v. Dakar, 611 F.3d 590, 601 (9th Cir. 2010).  Defendant argues that Plaintiff's conversion claim fails because the amount of commissions had not yet been determined at the time of the alleged conversion, so there is no specifically identifiable sum of money for conversion.  See PCO, Inc. v. Christiansen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, 150 Cal.App.4th 384, 395 (2007) ("Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment. [Citation.]". . . . A "generalized claim for money [is] not actionable as conversion.") (internal citations omitted).  There is no evidence that August 2013 commissions, or any other commissions thereafter, were reduced to specific determinable amounts.  Therefore, there is a triable issue of fact as to commissions in those uncalculated amounts.  However, there is a specific identifiable sum as to the July 2013 commissions -- the amount of commissions that Defendant announced had already been accrued in June to be paid on July 26, 2013, prior to its subsequent statement that commissions would be delayed.  See Mathews Decl. Ex. 5 at 3 (July 12, 2013 email announcing commissions scheduled to be paid on the July 26, 2013 pay date, and stating that the amounts had already been accrued on the June profit and loss statement for the relevant business units).

Defendant also argues that it had the right to alter even the already earned and calculated commission amounts, but California law is to the contrary where, as here, all conditions precedent for the payment of commissions were satisfied.  See London v. Sears, Roebuck & Co., 619 F. Supp. 2d 854, 863 (N.D. Cal. 2009) ("Under California law, commission-based wages are not earned until

United States District Court
For the Northern District of California

1  all conditions precedent for receiving the commission are satisfied."); Brown Decl. Ex. 2 at 66

2  (Defendant's Federal Rule of Civil Procedure 30(b)(6) deposition: "Q: Are you aware of whether

3  Mathews completed his performance of duties with respect to the sales by Orion of its services to

4  any customer . . . as the vice president of sales?  A: I'm aware he completed them. . . .  Q: So you're

5  not aware that he had anything else left to do with respect to working for any customers?  A: I am

6  not aware.").

7          Defendant also argues that even if there is a specific determinable amount of commissions,

8  Plaintiff cannot show that Defendant wrongfully retained the property because Defendant never told

9  Plaintiff that he was not entitled to the commissions.  See Collin v. American Empire Ins. Co., 21

10  Cal.App.4th 787, 812 (1994) ("In order to establish a conversion, the plaintiff 'must show an

11  intention or purpose to convert the goods and to exercise ownership over them, or to prevent the

12  owner from taking possession of his property.'") (internal citation omitted).  However, immediately

13  after Plaintiff sent his August 17, 2013 letter, Defendant sent an internal email with instructions to

14  "stop all checks and payments" to Plaintiff.  Brown Decl. Ex. 2 at Ex. 25.  The July 2013

15  commissions, which had already been earned and were due and owing to Plaintiff, were not properly

16  withheld from Plaintiff under California law.  Thus, drawing all inferences in the light most

17  favorable to Plaintiff, there is no triable issue of fact as to whether Defendant converted the July

18  2013 commissions, but there is a question of fact as to whether Defendant converted future,

19  uncalculated commissions.

20  **3.      There is a triable issue of fact as to Plaintiff's fifth, seventh, eighth and tenth claims, to**

21  **the extent that they depend on the premise that Defendant terminated Plaintiff without cause.**

22          Defendant argues that these claims fail because they rely on the premise that Defendant

23  terminated Plaintiff without cause, which Defendant disputes, and because Plaintiff did not show

24  good reason to resign, instead proffering his resignation subject to Defendant's option to meet his

25  demands, which Defendant did not accept.  Defendant argues that Plaintiff's salary, title and duties

26  remained the same during his employment, and that the Employment Agreement expressly allowed

27  his duties and commissions to be set and modified by Defendant.  Defendant also argues that

28  Parmar's belt-tightening and interest in sales activities did not undercut Plaintiff's role.

United States District Court
For the Northern District of California

Plaintiff argues, however, that he did not resign, and his August 17, 2013 letter merely expressed his view that he was giving Defendant the option to retain his employment by meeting his demands; rather, Defendant would have to affirmatively terminate him to end his employment. Plaintiff further argues that Defendant did materially diminish his duties, particularly pointing to testimony from Brinkman that Plaintiff had become subject to more oversight.

Defendant does not dispute that as of August 17, 2013, when Plaintiff sent his good reason letter, Defendant had frozen commissions that would have been paid in July 2013.  There is also no dispute that Defendant told Plaintiff in July 2013 that it was preparing a new commission plan that could affect past as well as future commissions and that commissions were on hold.  Defendant argues that even if the delay in payment of commission breached the commission plan (which Defendant disputes), it was not a material breach, and in any case, Plaintiff had not established an enforceable contractual obligation by Defendant to pay Plaintiff his commission that was due on August 27, 2013.  Defendant also argues that any obligation to pay Plaintiff at the time of the alleged breach of contract was too imprecise to be subject to breach.  See Scott v. Pacific Gas & Electric Co., 11 Cal.4th 454, 473 (1995) ("In other words, courts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise.").

Defendant does not dispute that commissions earned are wages, but argues that it did not deprive Plaintiff of any earnings because Plaintiff's commissions were subject to the reserved right to modify the commission plan.  See Prudential Ins. Co. v. Fromberg, 240 Cal.App.2d 185, 192 (1966) ("In the present case the standard wage was not arrived at on a straight commission basis; rather, defendant's compensation remained subject to all the contingencies set forth in the parties' agreement. These included plaintiff's right to withhold future commissions as offsets against its indebtedness, whether such indebtedness be considered as arising from loans to defendant to be repaid by him at the termination of his agreement or, as Williston has said, because 'commissions upon renewal premiums are not simply payment for securing the insurance but compensation for other services in the prosecution and preservation of the company's business; and, accordingly, if the agent is discharged for cause, or leaves voluntarily, the company is under no further liability in

**United States District Court**
For the Northern District of California

respect to the renewal premiums.'").  As explained above, however, Defendant's reserved right to modify the commission plan could not extend to past earned commissions under California law, and there is no dispute of fact that Plaintiff satisfied the conditions precedent to qualify for the commissions due to be paid in July 2013 based on June earnings.  See Asmus v. Pacific Bell, 23 Cal.4th 1, 16 (2000) ("Thus, an unqualified right to modify or terminate the contract is not enforceable.  But the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and reasonable notice.").

On balance, there are triable issues of fact as to whether Plaintiff resigned or not and whether Defendant terminated Plaintiff without cause.  Moreover, whether Plaintiff's diminution of authority was material for purposes of determining whether he had good reason to resign is a triable issue of fact.  Thus, summary judgment is denied as to the fifth, seventh, eighth and tenth claims.

**4.      There is no triable issue of fact as to Plaintiff's first, second and third claims for breach of contract and the fourth claim for violation of California Labor Code section 204 as to the July 2013 commissions.**

Plaintiff's complaint contains three breach of contract claims, alleging that Defendant breached each of the Commission Plans by failing to pay earned commissions.  Plaintiff also alleges a fourth claim for violation of California Labor Code section 204, alleging failure to pay wages due as of July 26, 2013.  See Cal. Labor Code § 204 ("All wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays. . . .").

Under California law, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."  Cal. Labor Code § 201(a).  Moreover, "commission-based wages are not earned until all conditions precedent for receiving the commission are satisfied."  London v. Sears, Roebuck & Co., 619 F. Supp. 2d 854, 863 (N.D. Cal. 2009) (citing Division of Labor Standards v. Dick Bullis, Inc., 72 Cal.App.3d Supp. 52, 57, 140 Cal.Rptr. 267 (1977)); see also Schachter, 47 Cal.4th at 622 ("In the analogous context of commissions on sales, it has long been the rule that termination (whether voluntary or involuntary)

1  does not necessarily impede an employee's right to receive a commission where no other action is

2  required on the part of the employee to complete the sale leading to the commission payment.").

3        Here, it is undisputed that Defendant had already calculated Plaintiff's commissions due to

4  be paid in July 2013. <u>See</u> Mathews Decl. Ex. 5 at 3. Further, Defendant's CEO testified that there

5  was nothing more to be done by Plaintiff with respect to the past customers on which the July 2013

6  commissions were based. Brown Decl. Ex. 2 at 66. Yet Defendant froze commission payments

7  without any advance notice to Plaintiff. Brinkman Decl. Ex. E. Although the commission plans

8  contained a clause reserving to Defendant the right to unilaterally change the plans, such a clause is

9  contrary to California law if applied retroactively. <u>See</u> <u>Asmus</u>, 23 Cal.4th at 16. Further, Defendant

10 has provided no evidence showing that the employment agreement was properly interpreted to allow

11 it to retroactively change the commission plans contrary to California law, especially in light of the

12 undisputed evidence that Defendant's former CEO assured Plaintiff and other employees that

13 Defendant would not apply that clause retroactively. <u>See</u> Mathews Supp. Decl. ¶ 6. In addition,

14 Defendant argues that these claims rest on whether Plaintiff was unilaterally terminated or whether

15 he resigned, relying on a statement in the 2011 and 2013 Commission Plans that if Plaintiff "resigns

16 his employment or is terminated by the Company for Cause (including performance, policy

17 violations or other misconduct), then [Plaintiff] will not be entitled to receive any Commissions that

18 are not paid as of the date of termination of employment." Mathews Decl. Ex. 1 at Ex. A at 2; Ex. 4

19 at 2. However, under California law, an employer may not withhold earned wages, so regardless of

20 whether Plaintiff resigned or was unilaterally terminated, he would be entitled to earned wages such

21 as the July 2013 commissions. Thus, as a matter of law and because there is no triable issue of fact,

22 summary adjudication is granted in favor of Plaintiff as to his first, second, third and fourth claims

23 for the July 2013 commissions, but not to the extent that Plaintiff's claims seek other, uncalculated

24 commissions.

25 **5.     There is a triable issue of fact as to Plaintiff's claim for breach of the implied covenant
        of good faith and fair dealing.**

26        Defendant argues that this claim fails because a claim for the breach of the implied covenant

27 of good faith and fair dealing requires the existence of a valid breach of contract claim. <u>See</u> <u>Guz v.</u>

28 <u>Bechtel Nat'l Inc.</u>, 24 Cal.4th 317, 349-51 (2000) ("The covenant thus cannot 'be endowed with an

existence independent of its contractual underpinnings.' It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."). Because there is a triable issue of fact as to at least part of Plaintiff's breach of contract claims, summary judgment is denied as to the fifth claim.

**6.     There is a triable issue of fact as to Plaintiff's claim for retaliation and wrongful termination in violation of public policy.**

    **A.     Retaliation**

        Plaintiff's retaliation claim was brought under California Labor Code section 98.6, which states:

> A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to his or her rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that he or she is owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in a proceeding pursuant to that section, or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her.

Cal. Labor Code. § 98.6.  Under California law, "To establish a prima facie case of retaliation 'a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.'" Mokler v. County of Orange, 157 Cal.App.4th 121, 138 (2007) ("An employee engages in protected activity when she discloses to a governmental agency 'reasonably based suspicions' of illegal activity."); see also Muniz v. United Parcel Service, 731 F. Supp. 2d 961, 969 (N.D. Cal. 2010).  Once an employee establishes a prima facie case of retaliation, the burden shifts to the employer "to offer a legitimate, nondiscriminatory reason for the adverse employment action." Mokler, 157 Cal.App.4th at 140 (quoting Morgan v. Regents of the University of California, 88 Cal.App.4th 52, 68 (2000).  Once the employer meets its burden, the burden then shifts back to the plaintiff to prove the employer's proffered reasons for termination are pretextual.  Id.

        Even if Plaintiff establishes a prima facie case, there is undisputed evidence that Brinkman

acknowledged Plaintiff's commissions concerns and repeatedly reassured Plaintiff that commissions would be paid.  During that time, Plaintiff sent his good reason letter, which was ambiguous as to Plaintiff's intent.  Further, as set forth above, there is evidence from which a trier of fact could find pretext.  Thus, there is a triable issue of fact as to Plaintiff's retaliation claim.

### B.      Wrongful termination in violation of public policy

Plaintiff argues that the eighth claim is for wrongful termination in violation of public policy. A claim for wrongful termination in violation of public policy has different elements: "(1) the existence of a public policy and (2) a nexus between the public policy and an employee's termination."  See Department of Fair Employment and Housing v. Lucent Tech., 642 F.3d 728, 749 (9th Cir. 2011).  Plaintiff notes that his termination came after he requested payment of his commissions in violation of California Labor Code section 98.6.  Plaintiff argues that he need not prove a violation of the law, and that Defendant can be liable for wrongful termination if Defendant fired Plaintiff for reporting his reasonable belief that Defendant had violated the law.  See Green v. Ralee Eng'g Co., 19 Cal.4th 66, 87 (1998) ("Moreover, as the Court of Appeal has held, an employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity.").  Plaintiff also points to evidence that Parmar emailed Brinkman three minutes after receiving Plaintiff's good reason letter from Brinkman, and stated that he would "take care of" Plaintiff.  The inferences to be drawn from Parmar's email and Plaintiff's August 17, 2013 letter raise triable issues of fact precluding summary judgment on this claim.

### 7.      There is a triable issue of fact as to Plaintiff's claim for waiting time penalties except for penalties as to the July 2013 commissions.

Penalties under California Labor Code section 203 are properly awarded when an employer "willfully fails to pay" an employee all wages owed at the times specified in Labor Code section 201, for discharged employees, and in Labor Code section 202, for employees who quit.  Cal. Lab. Code, § 203(a).  "[T]o be at fault within the meaning of [section 203], the employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due. As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act which was required to be done.' A good faith belief in a legal

defense will preclude a finding of willfulness." <u>Armenta v. Osmose, Inc.</u>, 135 Cal.App.4th 314, 325 (2005).

Defendant argues that because it had discretion to change the commission plan, and therefore, had a good faith basis to delay payment, and because Plaintiff's good reason letter constituted a resignation, Defendant had good faith grounds to challenge Plaintiff's entitlement to any commission and is not liable for waiting time penalties.  However, as described above, there is no triable issue of fact as to Plaintiff's entitlement to the July 2013 commissions, which were calculated and due to Plaintiff prior to his termination.  Thus, Plaintiff is entitled to summary adjudication of the claim for waiting time penalties for nonpayment of the July 2013 commissions. Because there is a triable issue of fact as to the nature and effect of Plaintiff's good reason letter, and as to the failure to pay the August 2013 commissions, summary judgment as to the claim for waiting time penalties is otherwise denied.

**8.      Plaintiff's prayer for punitive damages is not stricken.**

Defendant argues that all of Plaintiff's claims sound in contract, and that breach of contract claims do not support punitive damages.  Further, Defendant argues that Plaintiff cannot show malice for purposes of awarding punitive damages by Defendant because Plaintiff caused his termination by resigning in the good reason letter.   However, drawing all inferences in Plaintiff's favor, there is a triable issue of fact as to whether Defendant is liable under Plaintiff's tort claims. Thus, the prayer for punitive damages is not stricken.

**IT IS SO ORDERED.**

Dated:  August 27, 2014

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge